IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| ROBERT HANCHER, IV, | : | Case No. 3:11-cv-319 |
| Petitioner, | | District Judge Walter H. Rice |
| | : | Magistrate Judge Michael J. Newman |
| vs. | | |
| WARDEN, WARREN CORRECTIONAL INSTITUTION, | : | |
| Respondent. | : | |

# REPORT AND RECOMMENDATION[1]

This case is now before the Court upon Petitioner Robert Hancher's request for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 (doc. 2); Respondent's Return of Writ (doc. 9); Petitioner's Traverse (doc. 13);[2] Respondent's Surreply, filed with leave of Court (doc. 17); and Petitioner's response to Respondent's Surreply, also filed with leave of Court (doc. 18).

## I. BACKGROUND

### A. Factual Background

The Montgomery County Ohio Court of Appeals summarized the facts underlying Petitioner's convictions as follows:[3]

> Late in the evening of February 1, 2008, Robert Hancher; his half-brother, Antonio Gomez; his girlfriend, Grace Agullana; his friend, Robert (Tyler)

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.
[2] After the time for filing a Traverse had passed, Petitioner requested an extension of time and, in the interest of justice, the Court granted his request. Docs. 10, 12. Additionally, the Court Ordered Respondent to file the state court trial transcripts, as they were not initially filed with the Return of Writ. Docs. 19, 21.
[3] These factual findings are presumed to be correct because Petitioner has not rebutted that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007). This statutory presumption of correctness extends to factual findings made by state appellate courts on the basis of their review of trial court records. *Id.*

Kleekamp; Agullana's cousin, Megan Hayes; Timothy (T.J.) Bradley; and two female friends of Agullana (Stacy Kinsel and a woman identified only as "Michelle") gathered at Meercat's Bar, located at 1227 Wilmington Pike in Dayton, Ohio. Hancher called his friend, Paul Credlebaugh, to join them; Credlebaugh came with two other individuals, who left at about 11:30 p.m. Hayes invited Paul Day to come to Meercat's. Day came and later called his friend, Stephen Sipos, who met Day at Meercat's.

While in Meercat's, the group gathered at tables and at the bar. Hayes and Kinsel went behind the bar and served free mixed drinks to their friends. At one point, Sipos "made a pass" at Agullana. Agullana informed Hancher, who told Sipos that Agullana was his girlfriend. Sipos "brushed it off," and no confrontation occurred in the bar.

Shortly before 2:00 a.m., the establishment's owner announced that the bar would be closing. Hancher, Gomez, and Agullana left Meercat's by the establishment's back door. Sipos came out of the back door soon thereafter and began "exchanging words" with Hancher in the parking lot located behind Meercat's and several other businesses. Sipos and Hancher grabbed each other. Kleekamp exited the bar from the back door and approached the two men. When Credlebaugh left the bar, Kleekamp was standing behind and within reaching distance of Sipos. Credlebaugh saw that Hancher was "pretty heated" over something and asked him what was going on. Hancher responded that Sipos had said something about his (Hancher's) girlfriend. Credlebaugh told Hancher to "let it slide," but Hancher said that he would not let it slide.

Kleekamp "sucker punched" Sipos from behind, hitting him in the face. Sipos fell to the ground on his stomach. Hancher and Kleekamp began kicking Sipos repeatedly in the face and on his head. Credlebaugh stated that Hancher "was kicking [Sipos] hard, but nothing like the way [Kleekamp] was." Gomez punched Sipos in the head once and encouraged the assault. Credlebaugh stated that he approached and tried to pull Hancher and Kleekamp away from Sipos. Hancher eventually stopped kicking Sipos. Credlebaugh grabbed Kleekamp by his sweatshirt and pulled him off of Sipos. Credlebaugh yelled at the group to go to the car. Throughout the assault, Sipos did not try to defend himself and appeared to be unconscious.

As Credlebaugh went to check on Sipos' condition, Kleekamp returned and stomped down on the back of Sipos' head with his foot. Kleekamp then went to his car and sped away to Gomez's nearby apartment with Hancher, Gomez, Agullana, and Kinsel. At that time, Sipos was still breathing, but unconscious. Credlebaugh observed that Sipos' face and head were covered in blood. Credlebaugh left the parking lot and walked to Gomez's apartment.

Soon thereafter, Hayes and Day left Meercat's by the back door and saw someone on the ground in the parking lot. They approached and observed Sipos lying face down with blood around his face. Sipos was breathing "really weird," as if he were gurgling blood. They tried unsuccessfully to turn him over. Day called 911 and waited nearby for emergency assistance to arrive. Hayes went back inside Meercat's and told Michelle and Bradley about Sipos; the three left through Meercat's front entrance and walked to Gomez's apartment.

Brian Rinderle, the bouncer for nearby Taggart's Pub, had observed Kleekamp, Hancher and others yelling to a woman to get into Kleekamp's car and, after she got in, saw the car leave the Meercat's parking lot and speed away down Wilmington Pike. Rinderle and a security guard for Taggart's went to the back of Meercat's and discovered Sipos. The security guard contacted the police and learned that the police had already been notified of the assault. Rinderle and the security guard also waited for the police to arrive.

Dayton Police Officers John Howard and Dave Kluwan responded to the calls. Howard observed Day standing in the parking lot by the Pony Keg (another business that shared the parking lot with Meercat's); Day was waving his arms to get the officers' attention. Day advised Howard that his friend had been beaten, and he pointed the officers to Sipos's location. Medics arrived a few minutes later and transported Sipos to Miami Valley Hospital. Sipos died at the hospital.

At Gomez's apartment, Hancher and Kleekamp bragged about how they had beaten Sipos. According to Credlebaugh, Hancher said, "I showed him" and "I beat the hell out of the guy." When Hayes, Michelle, and Bradley arrived at Gomez's apartment, they informed the group that Sipos had died. Credlebaugh told Hancher that he was "done with [him]" and left the apartment. Hancher and Kleekamp began to discuss fleeing to Florida.

Hancher, Kleekamp, Agullana, Hayes, and Bradley left Gomez's apartment and drove in Kleekamp's car to Hancher's father's house near downtown Dayton. Hancher went inside to ask his father for money so that he could go to Florida. Hancher was unable to obtain money from his father, and he returned to the car. Kleekamp decided to drive to his uncle's house so that he could ask for money to go to Florida. Along the way, they took Hayes to her mother's home. Hayes tried to convince Agullana to come with her, too, but Agullana remained in the car. When Hayes got out of the vehicle, Hancher told her "not to tell anybody."

Kleekamp and Hancher continued to talk about running to Florida as they drove to Kleekamp's uncle's home. After Kleekamp talked with his uncle, the uncle called the police.

When the police arrived at Kleekamp's uncle's residence, Kleekamp, Hancher, Agullana, and Bradley went to the police station and provided statements. Kleekamp orally consented to the search of his vehicle and signed a form reflecting that consent. The police took photos of Kleekamp and Hancher and obtained Kleekamp's shoes and Hancher's boots and jeans; the police later obtained the jeans and polo shirt that Gomez had been wearing. Sipos's blood was found on Kleekamp's shoes, Hancher's boots, Hancher's jeans, and Gomez's shirt.

*State v. Hancher*, No. 23515, 2010 Ohio App. LEXIS 2047, at *2-7, 2010 WL 2225413, at *1-3

(Ohio Ct. App. June 4, 2010) (doc. 9-1 at PageID 109-13).

### B. Procedural Background

In June 2009, Petitioner was convicted by jury verdict of felony murder in violation of Ohio Revised Code § 2903.02(B) -- with a predicate offense of felonious assault under Ohio Revised Code § 2903.11(A)(2) -- in the Montgomery County, Ohio Court of Common Pleas. Doc. 9-1 at PageID 106, 138. Petitioner was sentenced to fifteen years-to-life imprisonment. *Id.* Before trial, Petitioner, with the assistance of counsel, filed a motion to suppress evidence, which the trial court denied following an evidentiary hearing. *Id.* at PageID 146-47, 161-75.

With the assistance of counsel, Petitioner timely appealed the trial court's judgment to the Second District Ohio Court of Appeals. *Id.* at PageID 176-206. Petitioner asserted the following assignments of error:

1. The trial court erred in denying [my] motion to suppress;

2. The trial court erred in upholding the jury's conviction for murder because the conviction was against the weight and sufficiency of the evidence;

3. The trial court erred in failing to give a charge for the lesser included offenses of voluntary and involuntary manslaughter; and

4. The trial court erred in failing to grant a mistrial for prosecutorial misconduct.

*Id.* at PageID 178-79 (capitalization altered; brackets added). On June 4, 2010, the Ohio Court of Appeals overruled all four assignments of error, and affirmed the trial court's judgment. *Id.* at PageID 108-35.

Petitioner, again with the assistance of counsel, appealed that ruling to the Supreme Court of Ohio, raising one assignment of error: "[My] constitutional right against self-incrimination was violated when [I] was not *Mirandized* prior to [my] custodial interrogation." *Id.* at PageID 399 (capitalization altered; brackets and italics added). On October 13, 2010, the Supreme Court of Ohio dismissed his appeal as not involving any substantial constitutional question. *Id.* at

4

PageID 446.

On September 6, 2011, Petitioner filed the instant petition for a writ of *habeas corpus*. Docs. 1, 2. He pleads two grounds for relief:

> GROUND ONE:  Petitioner's constitutional rights were violated when he was not *Mirandized* prior to his custodial interrogation, in violation of his 5th, 6th and 14th Amendment rights;
>
> Supporting Facts:  Petitioner was interrogated without being given his *Miranda* warnings and statements that were elicited during this interrogation were used at Petitioner's trial.  Physical evidence was also collected and subsequently used at trial in spite of the defense's attempts to have these statements and evidence suppressed.
>
> GROUND TWO:  Petitioner's conviction is not supported by sufficient evidence to sustain his conviction.
>
> Supporting Facts:  The State of Ohio did not prove beyond a reasonable doubt that the victim's murder was a proximate result of Defendant's commi[ssion of] or attempt to commit felonious assault, in violation of Ohio Revised Code 2903.02(B).

Doc. 2 at PageID 38, 40 (capitalization and punctuation altered; italics added).

## II.  ANALYSIS

### A.  AEDPA Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when the state court decides a federal constitutional claim on the merits, the federal *habeas* court must defer to the state court decision unless: (1) the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).  A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [the

5

Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08. "A state court's determination that a claim lacks merit precludes *habeas* relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 786 (2011) (citation omitted).

In reviewing a *habeas* petitioner's claims under 28 U.S.C. § 2254(d)(1), the Court is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011). Further, a state court's factual findings are presumed correct unless the petitioner rebuts them by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This statutory presumption of correctness also extends to factual findings made by a state appellate court's review of the trial record. *Girts*, *supra* note 3, 501 F.3d at 749.

Under principles of comity, the state courts should have the first opportunity to hear *habeas* claims and provide any necessary relief. *O'Sullivan v. Boerckel,* 526 U.S. 838, 844-45 (1999). Accordingly, a federal *habeas* petitioner must exhaust his or her state court remedies -- by fairly presenting his or her constitutional claims to the state's highest court -- before raising them in federal court. 28 U.S.C. § 2254(b); *O'Sullivan*, 526 U.S. at 844-45. If (1) the state court rejected the petitioner's claim based on his or her failure to comply with a state procedural rule, or (2) the petitioner failed to exhaust his or her state court remedies and no avenue of relief remains open, or it would otherwise be futile to pursue the state remedies, the petitioner has

waived that claim for *habeas* review under the procedural default doctrine. *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

### B. Ground One

In Ground One, Petitioner argues that his Fifth Amendment right against self-incrimination, established in *Miranda v. Arizona*, 384 U.S. 436 (1966), was violated. He claims the police elicited incriminating statements from him, and seized his clothing, without first reading him his *Miranda* rights. The Montgomery County, Ohio Court of Appeals disagreed with Petitioner, concluding that under the circumstances, Petitioner was not in custody:[4]

> The need for *Miranda* warnings is triggered by custodial interrogation. *Berkemer v. McCarty* (1984), 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317. The State may not use any statements made during a custodial interrogation unless it "demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, supra, 384 U.S. at 444. A determination whether a custodial interrogation has occurred requires the use of an objective standard of "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, supra, 468 U.S. at 442. "[I]n order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave." *Id.*
>
> With this standard in mind, we turn to the following evidence, which we adduced from the testimony of Detective Beane, Detective Hall, and Sergeant White given at the hearing on the motion to suppress. Hancher did not testify.
>
> Dayton Police Officers were dispatched to a call regarding an assault on Wilmington Avenue. Dayton Police Homicide Supervisor, Sergeant Gary White, was also dispatched to Meercat's Bar. By the time he arrived at the scene, the victim of the assault, Sipos, had already been removed from the scene by EMTs. White assigned Detective Hall to the parking lot scene and Detective Beane was assigned to interview witnesses at the scene.
>
> Beane interviewed two witnesses, and Hall conducted an investigation of the scene. In the meantime, Dayton Police Dispatch informed White that he should respond to an apartment on Coach Drive in Kettering, Ohio, to contact possible witnesses to the incident. White instructed uniformed officers to respond to that location. White also went to the Kettering address, as did Beane following her witness interviews. Hall returned to the Dayton Police Department Safety

---

[4] This Court looks to the Ohio Court of Appeals' decision, as it was "the last state court to issue a reasoned opinion on the issue." *Payne v. Bell*, 418 F.3d 644, 660-61 (6th Cir. 2005).

Building.

Ultimately, it was determined that Kleekamp's uncle, Jim Kleekamp, had called the Kettering Police, who in turn notified the Dayton Police Department that there were possible witnesses to the assault at the Kettering apartment.

Upon arriving at the Kettering residence, White and Beane noticed five or six marked police cruisers present in the parking lot without their overhead lights on. There were also several uniformed police officers in the apartment. Also present in the apartment were Kleekamp, his uncle, Hancher, Agullana and Bradley. At that point, White did not know whether the persons in the apartment were suspects or witnesses. Therefore, Tyler Kleekamp, Hancher, Agullana and Bradley were asked to go downtown for interviews. None of the four said that they did not want to go downtown; according to the testimony, it was agreed that they would all proceed downtown for further interviews.

The four individuals were then placed in four different cruisers and transported downtown. Of the four, only Kleekamp was placed in handcuffs. According to his escorting officer, the use of handcuffs was merely precautionary and was based solely on his decision to use the cuffs for "officer safety."

The four individuals were escorted into the Safety Building and placed in separate interview rooms. The doors to the rooms were left open, without a guard, but were in direct line of sight of the officers. Detectives Hall and Beane then conducted interviews of the four. They spoke to Hancher at about 6:30 a.m. Detective Hall asked Hancher about some redness and swelling around Hancher's left eye, about which Hancher appeared unaware. Hall then escorted Hancher to a bathroom, where he was able to observe his face in a mirror. Hall also observed what appeared to be drops of blood on Hancher's shoes and pants and asked Hancher if he would turn those items over to the police. Hancher stated that he would agree to turn over the items "as long as [he had] a pair of pants to wear" home. Hall found a pair of pants and gave those to Hancher. The interview with Hancher took about twenty minutes. After their interviews, the four were permitted to leave and were provided transportation home.

Although we regard this as a close issue, upon this record, we conclude that Hancher was not subjected to a custodial interrogation. The contact with the police was not triggered by a police investigation, but by Jim Kleekamp's call to the police. The four individuals did not attempt to leave the apartment before the arrival of the police, and then they agreed to go to downtown Dayton for interviews. There is no evidence that Hancher was handcuffed, or that he saw Kleekamp in handcuffs. While at the police station, Hancher was placed in an interview room, and the door to the room remained open. Hancher, though "somewhat defiant," cooperated with the police, and there is no evidence to indicate that his statements, and the surrender of his clothing, were other than voluntary.

Based upon the totality of the circumstances, the trial court determined that Hancher was not subjected to custodial interrogation necessitating the use of *Miranda* warnings. We agree, and conclude that the trial court did not err by overruling Hancher's motion to suppress.

Doc. 9-1 at PageID 115-18.

As the Ohio Court of Appeals correctly invoked *Miranda* and *Berkemer* in reviewing Petitioner's Fifth Amendment self-incrimination claim, the Court's task on *habeas* review is determine whether the state court's decision involved an unreasonable application of Supreme Court precedent. 28 U.S.C. § 2254(d)(1). In doing so, the Court must accept the facts set forth by the Ohio Court of Appeals, as Petitioner has failed to rebut those facts by clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Girts*, 501 F.3d at 749.

"The procedural safeguards outlined in *Miranda* apply only to suspects subject to 'custodial interrogation.'" *Hoffner v. Bradshaw*, 622 F.3d 487, 511 (6th Cir. 2010). The Sixth Circuit has explained the "custodial interrogation" requirement as follows:

> The *Miranda* Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444. A suspect is "in custody" for purposes of receiving *Miranda* protection if there has been a "formal arrest or restraint on freedom of movement." *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323 (1994) (per curiam). *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *California v. Beheler,* 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Mathiason,* 429 U.S. at 495). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984).

*Mason v. Mitchell,* 320 F.3d 604, 631 (6th Cir. 2003).

In *Yarborough v. Alvarado*, 541 U.S. 652 (2004), the Supreme Court similarly analyzed a state court's application of the *Miranda* custody test under AEDPA's unreasonable application prong. The Court found the *Miranda* custody test is a "general" rule -- rather than a specific one -- and noted that, "[a]pplying a general standard to a specific case can demand a substantial element of judgment." *Yarborough*, 541 U.S. at 664-66. While recognizing that "certain facts

9

weigh[ed] against a finding that [the defendant] was in custody" and "[o]ther facts point[ed] in the opposite direction," the Court concluded that the state court's application of the *Miranda* custody test was not objectively unreasonable. *Id.* at 664-65. *Accord Joseph v. Coyle*, 469 F.3d 441, 466-68 (6th Cir. 2006) (finding the state appellate court's decision was not objectively unreasonable despite the "differing indications" of whether the defendant was in custody for *Miranda* purposes).

In Petitioner's case, there are likewise "differing indications" of whether he was in custody. *See Yarborough*, 641 U.S. at 665. Indeed, the Ohio Court of Appeals acknowledged in its opinion that it was a "close issue." Doc. 9-1 at PageID 117. However, under AEDPA, this Court cannot grant *habeas* relief "by conducting [its] own independent inquiry into whether the state court was correct as a *de novo* matter." *Yarborough*, 641 U.S. at 665. Rather, *habeas* relief is available "only if the state court's decision is objectively unreasonable." *Id.* Here, the Ohio Court of Appeals reasonably determined that Petitioner was not subject to a custodial interrogation in light of the facts -- *i.e.*, his uncle called the police; Petitioner agreed to be transported to the police station for the interview, and cooperated with the police; he was not handcuffed; and the interview door remained open. *See* doc. 9-1 at PageID 117-18. Accordingly, Ground One should be **DISMISSED**.

### C. Ground Two

In Ground Two, Petitioner argues that his conviction is supported by insufficient evidence to satisfy the Due Process Clause. Respondent argues that Ground Two is procedurally defaulted because Petitioner failed to exhaust this claim in the state courts. The Court agrees with Respondent. Petitioner raised this issue on direct appeal to the Ohio Court of Appeals. *See* doc. 9-1 at PageID 177-206. However, he did not include this argument in his appeal to the

10

Supreme Court of Ohio. *See id.* at PageID 398-45. Failure to present an issue to the state supreme court on discretionary review constitutes procedural default. *O'Sullivan*, 526 U.S. at 845-48; *Williams*, 460 F.3d at 806-07 (finding a *habeas* claim is procedurally defaulted because, although the petitioner had raised the issue before the Ohio Court of Appeals, he failed to raise the issue before the Supreme Court of Ohio in his direct appeal).

Accordingly, to overcome the procedural default, Petitioner must "demonstrate[] cause for the default and prejudice resulting therefrom, or that failing to review the claim would result in a fundamental miscarriage of justice." *Williams*, 460 F.3d at 805-06. To meet the "cause" prong, a *habeas* petitioner must "show that some objective factor external to the defense" caused his failure to comply with the state's procedural rule, *Murray v. Carrier*, 477 U.S. 478, 488 (1986), and, if the petitioner fails to do so, the Court need not consider the prejudice prong. *Smith v. Murray*, 477 U.S. 527, 533-34 (1986).

As cause for his procedural default, Petitioner asserts the attorneys representing him on appeal to the Supreme Court of Ohio were ineffective for failing to raise his insufficient evidence claim. *See* doc. 13 at PageID 456-57. However, such alleged attorney error does not constitute cause to excuse his procedural default because he was not constitutionally entitled to counsel on discretionary appeal to the Supreme Court of Ohio. *See Coleman v. Thompson*, 501 U.S. 722, 755-57 (1991); *Arnold v. Warden*, 832 F. Supp. 2d 853, 859 (S.D. Ohio 2011).[5]

Alternatively, and assuming, *arguendo*, that Ground Two was properly preserved for *habeas* review, this claim fails on the merits. In order for a conviction to be constitutionally

---

[5] The United States Supreme Court's recent decision in *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012), does not change this result, contrary to Petitioner's arguments. *See* doc. 13 at PageID 457. In *Martinez*, the Court explicitly stated: "The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including …petitions for discretionary review in a State's appellate courts." *Martinez*, 132 S. Ct. at 1320 (internal citations omitted). *See Hodges v. Colson*, 711 F.3d 589, 602-03 (6th Cir. 2013); *Moore v. Mitchell*, 708 F.3d 760, 784-85 (6th Cir. 2013).

11

sound, every element of the crime must be proved beyond a reasonable doubt.  *In re Winship*, 397 U.S. 358, 364 (1970).  The test for analyzing sufficiency-of-the-evidence claims, established in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (*en banc*) (emphasis in original).  The Court should not "substitute its opinion as to the weight of the evidence or the credibility of witnesses."  *Benge v. Johnson*, 312 F. Supp. 2d 978, 1000 (S.D. Ohio 2004).

Not only is the *Jackson* standard itself demanding, but a *habeas* court must apply an additional level of deference in considering such claims under AEDPA.  *Davis*, 658 F.3d at 531.  A *habeas* court's task is to determine whether it was "objectively unreasonable" for the state court, applying the *Jackson* standard, to conclude there was sufficient evidence to support the conviction.  *Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008).

The Ohio Court of Appeals reviewed this claim, and reasonably determined that it had no merit:

> In this assignment of error, Hancher contends that his conviction for murder was based on insufficient evidence and was against the manifest weight of the evidence.
> Sufficiency and manifest weight challenges are separate and legally distinct issues. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541. "While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion." *Id.* at 390.
> A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *Id.* at 386. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven

beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

In contrast, when reviewing a judgment under a manifest weight standard of review "'[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717.

The indictment in this case charged that Hancher "did cause the death of another, to wit: STEPHEN SIPOS, as a proximate result of the offender's committing or attempting to commit an offense of violence, to wit: FELONIOUS ASSAULT, in violation of R.C. 2903.11(A)(1), a felony of the SECOND DEGREE ***." R.C. 2903.11(A)(1) provides that "[n]o person shall knowingly *** cause serious physical harm to another." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

First, Hancher argues that the State failed to present sufficient evidence that his "intent" was to cause serious harm to Sipos. Although Hancher does not dispute that Sipos's death was caused by blunt force injuries to the head and neck, he asserts that "it does not follow that just because Hancher punched or even kicked Sipos and Sipos later died, that Hancher's blows were made with an *intent* to cause *serious* physical harm as that term is defined in the Revised Code." Hancher argues that his lack of intent to cause serious physical harm is demonstrated by the coroner's testimony that Sipos's external injuries consisted of a split lip, a broken nose, and cuts above one eyebrow and his left ear, and by Sipos's lack of a broken skull, noticeable brain injury, broken bones (other than the nose), and damage to vital organs.

Contrary to Hancher's assertions, the State was not required to prove that he kicked and punched Sipos with the "intent" to cause serious physical harm. Rather, the State had the burden of proving that Hancher was aware that his conduct would probably cause serious physical harm to Sipos. R.C. 2901.22(B). On this record, we have no difficulty finding that the State presented sufficient evidence that Hancher knowingly caused serious physical harm to Sipos, which proximately resulted in Sipos's death. Credlebaugh, who stated that he had known Hancher his whole life and had been a very close friend of Hancher in February 2008, testified that he observed Hancher's assault of Sipos. According to Credlebaugh, after Hancher stated that he was "not going to let [Sipos's comments] slide," Kleekamp and Hancher simultaneously swung with their fists at Sipos's head. Although Credlebaugh described Hancher's punch as a "jab," the combination of Hancher's blow with Kleekamp's punch caused Sipos to fall to the ground. Credlebaugh then observed Hancher repeatedly "kicking [Sipos] hard" with his boots; all of the blows were to Sipos's head. Credlebaugh pulled Hancher away from Sipos. Credlebaugh further testified that Hancher had

13

bragged about "beat[ing] the hell out of" Sipos, upon returning to Gomez's apartment after the altercation.

Hancher's girlfriend, Agullana, did not see Hancher punch Sipos. However, she testified that, after Sipos was lying on the ground, Hancher was "bringing his foot back and kicking" Sipos. Agullana stated that the multiple kicks were "hard" and directed to Sipos's head. Both Credlebaugh and Agullana stated that Sipos did not react or do anything physically while he was on the ground being kicked.

Dr. Kent Harshbarger, forensic pathologist and deputy coroner for Montgomery County, conducted Sipos's autopsy. Dr. Harshbarger indicated that Sipos had suffered "multiple significant blows," and he identified at least ten separate impacts to Sipos's scalp. He stated that nearly all of Sipos's scalp had hemorrhage or blood loss due to blunt force injury. He opined to a reasonable degree of medical certainty that Sipos had died from blunt force injuries of the head and neck.

The State's evidence, if believed, was sufficient to demonstrate that Hancher knowingly caused serious physical harm to Sipos and that Sipos died as a result of the Felonious Assault. Upon review of the evidence in the record, we cannot say that the jury "lost its way" when it found Hancher guilty of Murder, as charged in the indictment.

Hancher further claims that there was no evidence that he aided or abetted his co-defendants in committing Felonious Assault. R.C. 2923.03(A)(2), the complicity statute, provides: "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * (2) Aid or abet another in committing the offense." A person who is complicit in an offense may be charged and punished as if he were the principal offender, and a charge of complicity may be stated under R.C. 2923.03 or in terms of the principal offense. R.C. 2923.03(F). "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2*)*, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 245, 2001 Ohio 1336, 754 N.E.2d 796; *State v. Wilson*, Montgomery App. No. 22581, 2009 Ohio 525, P27.

The State provided ample evidence that Hancher acted in concert with Kleekamp in committing a Felonious Assault. As stated above, Credlebaugh testified that Hancher and Kleekamp punched Sipos simultaneously after Sipos approached Hancher and Agullana using obscene language and hand gestures. The two men then, together, repeatedly kicked Sipos in the head while Sipos lay unmoving on the ground; Kleekamp stomped Sipos's head in a "ruthless" manner. The coroner's evidence established that the multiple blows to the head and neck caused Sipos's death. In short, even if Kleekamp struck more serious blows, the State presented sufficient evidence that Hancher aided and abetted Kleekamp in committing Felonious Assault, which resulted in Sipos's death.

Doc. 9-1 at PageID 118-22.

The Ohio Court of Appeals reasonably determined that, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of felonious assault and felony murder were proved beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. The coroner opined that the victim died from blunt force injuries. Doc. 21-2 at PageID 603-04. The State presented two eyewitnesses who testified that Petitioner and his co-defendant hit the victim, and repeatedly kicked the victim in the head while he was on the ground. Doc. 21-2 at PageID 672-76, 772. In addition, a witness testified that Petitioner bragged about beating the victim. Doc. 21-3 at PageID 700-01.

In sum, Ground Two should be dismissed because it is procedurally defaulted; and, even if it were not, it fails on the merits.

### III. RECOMMENDATION

Based on the foregoing analysis, it is **RECOMMENDED** that Petitioner's § 2254 petition for a writ of *habeas corpus* be **DISMISSED** with prejudice, and this case be **TERMINATED** upon the Court's docket.

Reasonable jurists would not disagree with the recommended disposition on all grounds for relief. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Further, an appeal of an Order adopting this Report and Recommendation would not be taken in objective good faith. *See* 28 U.S.C. § 1915(a)(3); *Coppedge v. United States*, 369 U.S. 438, 445-46 (1962). Therefore, if Petitioner seeks to appeal an Order adopting this Report and Recommendation, the Court **RECOMMENDS** that Petitioner be **DENIED** a certificate of appealability as well as *in forma pauperis* status on appeal.

June 3, 2013  s/ **Michael J. Newman**
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B)(C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).